Filed 7/25/25  In re C.H. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re C.H. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,  Plaintiff and Respondent,  v.  C.H.,  Defendant and Appellant. | F089250  (Super. Ct. Nos. 23CEJ300089-1, 23CEJ300089-2, 23CEJ300089-3, 23CEJ300089-4)  **OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  Amythest Freeman, Judge.

C.H., in propria persona; Susan M. O'Brien, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P. J., Meehan, J. and DeSantos, J.

**INTRODUCTION**

Appellant C.H. (mother) is the mother of four children, sons C.H. (age 11), Sh.H. (age 10), E.H. (age nine), and daughter Sa.H. (age nine).[1]  Mother appeals from an order following a Welfare and Institutions Code section 366.26[2] hearing.  On appeal, appellate counsel filed a letter brief that summarized the facts and procedural history with citations to the record, raised no issues, and asked this court to independently review the record pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835 (*Phoenix H.*) and *In re Sade C.* (1996) 13 Cal.4th 952 (*Sade C.*).

By separate communication, this court notified mother that her counsel had filed a brief indicating there were no arguable issues on appeal, and we invited her to file a supplemental letter setting forth any issues she believed should be reviewed by this court.

On May 7, 2025, the mother filed a letter requesting leave to file a supplemental brief, and arguing that the children's father is deceased, she is a widow, and she completed all classes she was directed to complete.  This court granted mother's request. Mother did not subsequently file a supplemental brief, and this court construed her letter as a letter brief seeking to set forth good cause of an arguable issue of reversible error.

We find no arguable issues and dismiss the appeal.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY[3]**

*Initial Petition*

On April 3, 2023, the Fresno Department of Social Services (the department) filed a section 300 petition alleging the children suffered, or there was a substantial risk that

---

[1]    Together "the children."  Ages denoted are the ages of the children as of April 2023.

[2]    Further undesignated references to code are to the Welfare and Institutions Code.

[3]    The facts are summarized to those relevant to the issues presented in this appeal. A more thorough recitation of the facts preceding the August 23, 2023 jurisdiction and disposition hearing may be found in the prior appeal, *In re C.H.* (Sept. 20, 2024, F086801) [nonpub. opn.].

the children would suffer, serious physical harm or illness as a result of mother's failure or inability to supervise or protect the children adequately (§ 300, subd. (b)(1)(A)), and as a result of mother's failure to provide regular care for the children due to mother's mental illness, developmental disability, or substance abuse (§ 300, subd. (b)(1)(D)). The petition alleged mother had untreated mental health issues, which hindered her ability to provide regular care, supervision, and protection for her children, and that on April 2, 2023, mother had been placed on a section 5150 hold for being in a manic state. The petition further alleged mother had a history of suicidal ideation and self-harm and was previously placed on a section 5150 hold.

On April 2, 2023, at approximately 1:00 p.m., social worker Jenifer Moore responded to the Fresno Police Department and met with Officer Anthony Rodriguez and behavioral health clinician Jaime Carlos from the behavioral and mental health clinic. Rodriguez informed Moore that C.H. was brought to the police station by a family friend. Mother had called the friend and said she could not have C.H. in the home and asked the friend to take C.H. " 'somewhere' " without specifying where or for how long. C.H. had reportedly been having behavioral problems since his father died in May 2022. The friend tried to take C.H. to a shelter for unhoused youth but it was closed. The friend then brought C.H. to the police station and asked for resources.

Rodriguez called the mental health clinic but was informed C.H. did not meet the criteria for a section 5150 hold. Rodriguez then called mother, who said C.H. could not return home. She did agree to come to the station with her other children.

At the station, mother maintained that C.H. could not return home but was unable to provide a reason. During her conversation with Rodriguez, she began to cry "hysterically" and fell to the ground. She repeated that C.H. could not go home with her because he "does not like her" but could not otherwise provide a coherent explanation why she did not want C.H. at home.

3.

Carlos indicated mother was in a manic state because she was unable to regulate her emotions or heart rate. Mother did not report prior mental health issues or diagnoses to Carlos. When asked whether she had knowledge of a section 5150 hold, mother smiled and refused to speak. Mother was taken to a crisis stabilization center, while screaming that her children could not go into foster care because Sa.H. was a female and would be molested.

*Proceedings Leading To August 23, 2023 Jurisdiction and Disposition Hearing*

On April 5, 2023, the juvenile court held an initial detention hearing where the children were detained, and the court found no reasonable means by which to protect the children's health without removal, and that reasonable efforts had been made to prevent the need for removal. The court ordered reunification services for mother and visitation with the children at a minimum of one time per week.

During one of the subsequent visits, the children disclosed that mother believed many things were " 'satanic,' " had hit the children with a belt in the past, and withheld food from the children. C.H. recounted a time when he snuck a cookie from the pantry and mother got on top of him and pulled the cookie out of his mouth. C.H. stated that he was " 'saying everything so that the social worker will document it.' " The children then proceeded to call mother a liar after she denied everything. The children stated they enjoyed living with their caretaker, Yazmin R., because they were no longer hungry "like they used to be" and C.H. said he wanted mother " 'to be a better mom.' " The children all expressed concern about returning to mother's custody because they did not believe mother could care for them or feed them.

*August 23, 2023 Jurisdiction and Disposition Hearing*

On August 23, 2023, the juvenile court held a combined jurisdiction and disposition hearing. Mother testified, as did several witnesses on mother's behalf.

The juvenile court concluded:

4.

"Based upon the reports that were presented to the Court and the evidence that was presented to the Court including testimony and letters from parties as well as the certificate that was provided to the Court this afternoon, I will find that there is clear and convincing evidence that continuance of the children in the home of [mother] is contrary to the children's welfare and there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the children if the children were returned home and there are no reasonable means by which the children's physical health can be protected without removing the children from [mother's] physical custody.

"That being said, I want to state that I agree … that [mother's therapist's] testimony was credible. I believe that [mother] is making progress. I do not expect perfection from parents because I agree with [mother] that there is no perfect parent. However, given what she's been through, given what the children have been through, and given [mother's] testimony that all she wanted was support, I believe that this can be a positive experience for [mother] and that she can get the support that she needs from the [department] and that can help her be a better parent in the future.

"I share the concerns of the [d]epartment of the well-being—the emotional well-being of the children. I share the concerns of the [d]epartment and mother kind of confirmed this in her testimony, there's a difference between gossip and the children telling the truth about what goes on in their lives to professionals who are employed and who are—it is their responsibility to make sure that children are safe. And if [mother] is discouraging that I believe she's going to regret that decision later.

"We have people … employed in these professions for a reason and sometimes that's because there are strangers that cause harm to children. The children should not be [discouraged] from discussing their emotional, physical, well-being with people who are obligated to look out for their best interest.

"Something else that was noteworthy from [mother's] testimony and I may never know the answer to this question, what was wrong with [C.H.] on [April 2, 2023] when he woke up screaming. Her testimony was that it was a piercing scream so it would seem to this Court that prior to April 2[,] there was some emotional instability going on with [C.H.].

"I'm concerned about mother's instability and I think that the children are reflecting that. I hope that the orders of this Court today and

5.

the participation by [mother] in the services that are going to be asked of her help her to address the instability, the emotional instability."

The juvenile court found reasonable efforts had been made to prevent or eliminate the need for removal of the children from the home and to make it possible for the children to return to their home. The court found the extent of progress by mother toward alleviating or mitigating the causes necessitating placement in foster care had been minimal. The children were made dependents of the court pursuant to section 360, subdivision (d), placed with their care provider, and mother was ordered services, including a mental health evaluation, any recommended treatment, and visitation.

Mother filed a timely appeal of the August 23, 2023 order. This court affirmed the order on September 20, 2024. (*In re C.H.*, *supra*, F086801.)

*Period of Reunification Services Ending February 14, 2024*

On September 20, 2023, the juvenile court granted mother's request to relieve her private attorney and appointed counsel. The court then granted appointed counsel's request that a guardian ad litem be appointed to assist in providing representation to mother.

A status review report filed on February 14, 2024, described mother's progress with her case plan and with the children. In summary, the report indicated mother believed that the social worker and Yazmin were "out to get her" and the children. At times, mother refused to work with the department or communicate with the assigned social worker, because the social worker was "not a holy person" and was "out to get her and adopt her children out." The report described mother as becoming "delusional and confrontational" when things did not go her way.

The report described Yazmin's attempts to be proactive and engage with mother by allowing mother into her home and to be present for activities with the children. Yazmin also coordinated activities between mother and the children, such as trips to the lake and the grocery store. However, at the grocery store, mother refused to get any of the

6.

children's favorite foods or even buy body soap that one of the children selected. The children remained concerned about mother's dietary restrictions and food insecurities and reported they returned from visits hungry.

Mother indicated she is not working and would be a full-time, in-home caretaker for the children when they were in her care full time. Mother visited the children twice a week for five hours unsupervised, but the children indicated they felt forced to visit and did not wish to reunify with mother. The children stated that when visiting, mother only allowed them to sleep or read the bible.

Mother was ordered to attend parenting classes and undergo mental health and domestic violence assessments along with any recommended treatment. Mother completed her parenting program on August 7, 2023. She completed her domestic violence assessment on April 20, 2023, and was recommended a 52-week child abuse intervention program. Mother also began comprehensive counseling services on May 31, 2023, but did not appear " 'able to obtain a clear understanding of the severity of her referring incident.' " For instance, mother reported there were no personal changes on her end when she was asked during the group session of any personal changes regarding her case and present situation. She was terminated from the program due to repeated absences, and re-enrolled on November 27, 2023, completing 30 sessions without absences. Mother continued biweekly sessions with her therapist, Jamal Jones, LMFT, who indicated the mother was making "tremendous progress" toward her goals.

On July 21, 2023, the department conducted a virtual child and family team (CFT) meeting. When the department expressed concerns about the children's interactions with mother, she became emotional and accused the social worker of "plotting to keep her children away." Mother was unable to redirect and had to be muted because the children were present, ultimately becoming so dysregulated the department ended the meeting.

Sometime after the July 21, 2023 CFT meeting, Yazmin called for a welfare check on mother after mother made comments that she wanted to die and wanted to kill herself

because she was unable to spend more time with the children. Mother was placed on a section 5150 hold. On July 27, 2023, the social worker attempted to talk to mother about the section 5150 hold, but mother refused to disclose any information to the department.

On July 31, 2023, the department progressed mother to third party supervised visits, with Yazmin supervising mother's visits with the children. At these visits, mother told Yazmin that she could leave the children with mother unsupervised. On one occasion, mother aggressively pulled C.H. away from Yazmin's son, whom C.H. was hugging. Mother then told C.H. that no one was ever going to love him like she did.

At a CFT meeting on October 23, 2023, the children expressed they did not like to be hugged and kissed by mother, who was not respecting their boundaries. The team decided that mother would not progress in visits at this time and also that Yazmin would no longer supervise visits because mother made her feel uncomfortable.

At a CFT meeting on December 5, 2023, the children indicated some continued issues with food, but an overall improvement in mother's behavior. The department proceeded with unsupervised visits between mother and the children twice weekly for five hours.

Mother participated in a psychological evaluation, beginning January 22, 2024 and ending January 29, 2024. The doctor assessing mother stated she was very reluctant to answer any questions and did not openly participate in her assessment. Instead, mother stated that "God has her and she is with God."

At a CFT meeting on February 2, 2024, the department noted mother was compliant with some parts of her case plan, but struggling with others. She had completed her parenting classes and was in the process of completing her child abuse intervention program, but the children expressed they did not want to attend visits due to mother's views on food. The children reported mother did not feed them food they liked, and on one occasion, mother dragged one of the children along the floor because the child

was fighting with a sibling. Mother stated what the children were saying was true and that "God would help her reunify with her children."

On February 5, 2024, after several family therapy sessions, the family therapist contacted the department with an update. She stated the children were adamant they did not want to return home to mother. Mother indicated she did not believe therapy would help her or the children. When the children told mother they did not want to return to her, mother presented a flat affect, began to quote bible verses, and stated that "she knows God will reunify her with her children." The therapist stated she did not believe continued family therapy would be helpful to the family.

The juvenile court held a six-month review hearing on February 14, 2024. The department recommended mother continue receiving reunification services, which the court ordered. The court then scheduled a section 361.22, subdivision (f) hearing for May 1, 2024.

*Period of Reunification Services Ending July 8, 2024*

On February 20, 2024, the department was informed by the family therapist that the family therapy sessions were ending because mother was not a willing participant, and the children reported they did not want to improve their relationship with mother.

On March 15, 2024, social worker Leslie Rocha-Barraza and social worker Escoto conducted a visit of mother's home during one of mother's unsupervised visits with the children. Mother refused to allow the social workers inside. The social workers were able to initially speak with the children at the door. The children stated that mother had a friend who had been around during their visits and whom they believed was mother's boyfriend. The children were concerned the friend was moving into mother's home due to boxes in the home. Since the friend had been around, mother had become stricter with food. The children described one occasion when the friend began to yell at Sa.H. and shamed her for eating ice cream with chocolate chips.

9.

Mother then invited the social workers into the home but became very upset when asked about the friend. The social workers stated they simply wanted to discuss the concerns the children had raised, but mother became emotionally distraught and started stating, "God was coming back for his second return." Rocha-Barraza tried to explain that if someone was spending a significant amount of time around the children, the department needed his information to clear him through a background check, but mother ignored her questions. Instead, mother kept repeating, "God was coming back for his second return to save everyone" and "God was going to reunify her with her children." After the visit, Yazmin reported mother had called her and stated she wanted to close her case and give the children to Yazmin full time. Rocha-Barraza was unable to reach mother by telephone to confirm. Yazmin also informed the department that mother has asked her to allow the children to spend the night with mother and that "the department does not have to know."

On March 26, 2024, mother was late for her comprehensive counseling services appointment, later telling the counseling services office it was due to the financial burden of paying for gas. Rocha-Barraza contacted mother's guardian ad litem to reschedule the appointment but was unable to contact mother to inquire if she needed further assistance.

The department received a psychological evaluation and risk assessment of mother on April 24, 2024. The assessment stated that " 'due to [the] level of defensiveness, testing results are not likely to be an accurate representation of [mother's] current level of intellectual and psychological functioning.' " From the assessment, the doctor reported a "diagnostic impression" as "[o]ther [s]pecified [p]ersonality [d]isorder with mixed personality features of borderline [p]ersonality [d]isorder and [a]voidant [p]ersonality [d]isorder." The report also outlined a moderate risk to the children should they be returned to mother's care, due to mother's "long-standing untreated emotional dysregulation, difficulty managing anger or frustration and history of danger to self and other mental health concerns."

10.

On May 3, 2024, mother's visits with the children were reduced to two hours two times a week due to concerns about safety and the children's request for less time. On May 31, 2024, Rocha-Barraza spoke with the children. C.H. stated he enjoyed spending less time with mother, and that mother had not made any changes in allowing them to eat and continued to restrict food. Sh.H. stated the visits were " 'alright' " but he did not feel safe with mother because she did not feed the children and did not know how to take care of them. E.H. stated the visits were " 'kinda good,' " but that one time mother stated she was going to take them to a lake and E.H. was "scared of what she would do." Sa.H. stated the visits were "somewhat bad," because mother was always on her phone and would bring random people to the house. When Sa.H. told mother she felt uncomfortable, mother told her she "should not defy her."

On June 12, 2024, mother called the social work supervisor and stated that her mental health records were confidential and her mental health is "between her and [G]od[,] not anyone else." When the supervisor attempted to get clarity, the call ended abruptly and mother did not answer the phone when the supervisor called back.

On June 13, 2024, the children told Rocha-Barraza and Escoto during a home visit that mother would cry and attempt to bribe and "guilt trip" them into visiting her. Mother would ask, " '[D]o you hate me?' " and " 'Do you wish I was not your mom?' " C.H. stated he felt uncomfortable when mother picked him up at the bus stop and did not allow him to choose if he would like to visit. The children reported mother would show up to the care provider's house unannounced and ask the children to go with her.

Yazmin recounted how the children refused a visit one day, and mother stood at Yazmin's patio glass door crying so the children could see her. Mother also would tell the children " 'Yazmin says you HAVE to go with me' " after they refused a visit. Mother would cry and hit her head on the steering wheel when the children stated they did not want to go. Mother also referred to Yazmin as " 'slave master' " and stated that

Yazmin was withholding her children.  When mother had the children, she kept them past her allotted time and would show up and walk into Yazmin's house unannounced.

*July 8, 2024 Contested 12-Month Review Hearing*

The juvenile court held a contested 12-month review hearing on July 8, 2024, at which the department recommended terminating services to mother and proceeding to establish a permanent plan for the children.  On July 15, 2024, the court ruled on the matter as follows.

> "The issue that has caused me to read and re-read several parts of this—the evidence in this case is really the contradictions in [mother's] parenting.  While I respect her desire for the children to follow her beliefs, for her children to be obedient and respectful to their elders, it was a little confusing to the Court that while [mother] desires that of her children, [mother] throughout the case didn't follow the Court's rules and didn't follow the [d]epartment's rules and wanted to sidestep a lot of the things that the [d]epartment and the Court were asking her to do and make her own rules and ask other people to go along with her and to not follow the Court's rules with regard to supervised visits or how long the visits should be .…

> "I also respect [mother's] desire for privacy and could tell that it was very difficult for [mother] to share certain things with the social worker as well as therapist .…  I respect her desire for privacy and I respect her belief that her children should not air their private issues to strangers.  The only issue that I have with that is that from decades of practice, we have learned that not all elders deserve that type of privacy and there [were] so many occasions where the children were discouraged from speaking to the social worker, discouraged from speaking to law enforcement, and I think that it's very important that [mother] understand that the desire [for] the social worker to screen the individuals that the children were going to spend their time around and the desire of the social worker to hear, or the therapist, to hear the concerns of the children were not in any way to attack [mother]. The children should have the support of their mother in being able to address concerns with trusted professional people.  [¶] … [¶]

> "It seems as though [mother's] solution to this problem of having the children go against her principles is getting further and further toward isolation.…

"The children have repeatedly stated that it would cause them detriment to their emotional well-being if they were returned to [mother's] physical custody. Maybe that is because they are in fear that that isolation could result in actual physical danger; maybe it is because the isolation from their peers and from the community that they believe is important and that their mother may not believe is important would cause them emotional distress.

"The [d]epartment tried to discuss with mother the need to work these things out through therapy and it seemed like mother was not willing to do so because she wanted to keep her business private is the assumption that I'm making, which I respect, but in order to work out the problems so that the children don't feel traumatized by the return to their mother, I wish they could have been explored further in the therapeutic visits or in the therapy.

The [d]epartment tried to express to mother that it was important to clear any individuals who were going to be frequenting her home and mother did not want to comply with that request. The [d]epartment goes through all of these steps in order to give the Court the information that the Court needs to feel like I can make an order returning the children to [mother's] care and that the children are going to be safe. Without providing the information to the [d]epartment so that they can tell the Court we've cleared all individuals who are going to be in the home, I can't have that confidence, I can't be confident that the children are going to be safe in [mother's] care. So whether it was to maintain her privacy or for other reasons, the behavior of [mother] and the opinions of the minors as well as the other individuals who have been involved provide the Court with the evidence that I need to follow the recommendation of the [d]epartment."

The juvenile court concluded mother's progress toward alleviating or mitigating the causes necessitating placement in foster care had been moderate, but return of the children to mother would create a substantial risk of detriment to the safety, protection or physical or emotional wellbeing of the children. Mother was informed of her right to file a writ based upon the order made by the court, and that she would need to file a notice of intent within seven days.

13.

*Proceedings Leading to January 6, 2025 Section 366.26 Selection and Implementation Hearing*

A section 366.26 report filed on January 6, 2025, described the events leading up to the section 366.26 selection and implementation hearing.

On August 14, 2024, Yazmin stated that she was assigned as the third-party supervisor for mother's visits with the children. The visits occurred in the community, at mother's home, or in Yazmin's home. Mother would "cry and tantrum like a child" when she was told " 'no' " or was redirected. On one occasion, mother took Sa.H to the bathroom and cut her hair without permission because mother was mad Sa.H. visited her grandmother and put " 'chemicals' " in her hair. When confronted, mother lied about cutting Sa.H's hair, but Yazmin saw Sa.H.'s hair in mother's purse.

In a more recent incident, mother requested to be present at the children's health appointments. Yazmin agreed to let mother attend the appointments, but overheard mother tell the dental office receptionist to list mother as a parent and put her information for the children. When Yazmin redirected her, mother began screaming in the office in front of the children and others that Yazmin was "stealing" her children and later claimed that Yazmin had assaulted her. The medical office staff called the police and hid Yazmin and the children in the back office while the police responded. Yazmin stated she did not want to supervise visits any longer and feared for her life. Mother had told her "if she wanted to, she would have killed her[, the] children and [Yazmin's] children" and described how she would cut their throats with a knife while they slept, starting with her oldest son.

On August 14, 2024, the department made contact with mother to arrange supervised visitation. Mother stated "she would rather see her children in heaven [than] have her visits supervised" by the department or a visitation center. Mother claimed she had never cut Sa.H.'s hair and also denied the incident at the dentist's office had occurred. Mother reported these were false allegations.

On October 30, 2024, Yazmin reported that mother had ongoing issues with feeding the children and the children returned hungry from most visits. The children stated they did not want to reunify with mother and food was an ongoing problem. Mother would not purchase food the children liked even when Yazmin provided mother money for food.

Mother did not maintain contact with the department. Yazmin reported mother was visiting the children consistently and while there were ongoing conflicts between mother and the children, mother was improving and showing more flexibility.

*January 6, 2025 Section 366.26 Selection and Implementation Hearing*

The juvenile court held a section 366.26 selection and implementation hearing on January 6, 2025, where the recommended permanent plan for the children was to remain in the custody of Yazmin, who would become their legal guardian. Mother's parental rights would not be terminated and mother could file a section 388 motion should her circumstances change. Mother objected to the recommendation but did not set the matter for a contested hearing. The court found the children were not likely to be adopted and the appropriate permanent plan for the children was legal guardianship. Mother was ordered visitation at a minimum of once a month for one hour.

On January 27, 2025, mother filed a timely appeal.

## DISCUSSION

In lieu of an opening brief, appellate counsel prepared a letter brief pursuant to *Phoenix H.*, *supra*, 47 Cal.4th 835 and *Sade C.*, *supra*, 13 Cal.4th 952, indicating counsel found no issues on appeal and requested that mother have an opportunity to personally file a letter brief to make a good cause showing that an arguable issue does exist. In *Phoenix H.*, our Supreme Court held that in juvenile dependency cases, "the Court of Appeal has the discretion to permit the parent to personally file a brief and must do so only upon a showing of good cause that an arguable issue does, in fact, exist." (*Phoenix H.*, at p. 844.)

15.

By separate communication, this court notified mother that her counsel had filed a brief indicating there were no arguable issues on appeal, and we invited her to file a supplemental letter setting forth any issues she believed should be reviewed by this court.

On May 7, 2025, mother filed a letter describing her hardships as a widow and stating that she had completed her classes.[4] In response, on May 9, 2025, this court issued an order granting mother's request for leave to file a letter brief raising arguable legal issues in this case. The brief was due on or before May 22, 2025, but none was filed. On May 29, 2025, this court construed mother's letter as a letter brief seeking to set forth good cause of an arguable issue of reversible error.

This court presumes a trial court judgment is correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Mother, appellant, bears the burden of establishing error. Where an appellant does not establish error, we may dismiss the appeal. (*Sade C.*, *supra*, 13 Cal.4th at p. 994.) While heartfelt, mother's statements present no arguable issue calling into question any of the juvenile court's findings or the January 6, 2025 order.

Unlike in a criminal case, we have no duty to conduct an independent review of the record in a dependency case. (*Phoenix H.*, *supra*, 47 Cal.4th at pp. 844–846.) Nonetheless, out of an abundance of caution, we independently reviewed the record to confirm there is no good cause that an arguable issue exists. On the record before us, we find nothing to indicate an arguable issue exists.

## DISPOSITION

Because no claim of error or other defect has been raised in this matter, the appeal is dismissed. (*Phoenix H.*, *supra*, 47 Cal.4th 835; *Sade C.*, *supra*, 13 Cal.4th 952.)

---

[4] Mother likewise requested that counsel be relieved and to represent herself. Mother has failed to specify any grounds for relieving appellate counsel, and based on our examination of the record, we discern no failure of appellate counsel to effectively represent mother as no arguable issues exist. Accordingly, mother's request to relieve appellate counsel and to represent herself is denied.